UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| CAROL JOHNSON, ) | Civil Action No.: 4:09-2530-TLW-TER |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | |
| ) | **REPORT AND RECOMMENDATION** |
| ) | |
| CITY OF NORTH MYRTLE BEACH, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**I.     INTRODUCTION**

In this action, Plaintiff brings a claim for gender discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. Presently before the Court is Defendant's Motion for Summary Judgment (Document # 23). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

**II.     FACTS**

Plaintiff began her employment with the Defendant on September 26, 2002. Plaintiff started her employment with the Defendant as a communications officer/jailer. Plaintiff Dep. p. 11. Plaintiff later became a police officer on patrol. Plaintiff Dep. p. 11. Plaintiff worked patrol until her termination in 2008. As a patrol officer Plaintiff was required to patrol the city alone. Plaintiff Dep. p. 14.

In 2005, William Bailey was appointed Director of the City's Public Safety Department.

Plaintiff Dep. p. 15. Prior to that time, he had served as a lieutenant and was Plaintiff's immediate supervisor. Plaintiff Dep. p. 15. Plaintiff felt that she and Bailey had a good working relationship until he became the Public Safety Director. Plaintiff Dep. p. 15. She testified that once Bailey became Director, his treatment of her changed. Plaintiff Dep. p. 16.

In a questionnaire Plaintiff completed pursuant to the charge of discrimination she filed with the South Carolina Human Affairs Commission (SCHAC), Plaintiff wrote: "After my husband and I became separated and questions of my sexual orientation started spreading along with rumors of me and a female co-worker, that is when I started receiving write ups." Plaintiff Dep. Ex. 27. Plaintiff testified that she was referring to rumors that she was involved in a lesbian relationship with her roommate and co-worker, Pam Cooper. Plaintiff Dep. pp. 16-17. Plaintiff separated from her husband in May 2006, and their divorce was finalized in September 2007. Plaintiff Dep. pp. 43, 89.

Plaintiff was considered a meets expectations employee. Plaintiff Dep. Ex. 10, 15. In September 2007, Plaintiff received an award for five years of faithful service with the Defendant. Letter (attached as Ex. 5 to Plaintiff's Response). However, during the course of her employment with the City, Plaintiff received a number of disciplinary writeups. In February 2005, Plaintiff was written up for a confrontation with a superior officer at a firing range. Plaintiff Dep. Ex. 2. She explained that she had finished a training class test and picked up her classmate's test to compare answers. Plaintiff Dep. p. 28. Her superior accused her of cheating. Plaintiff Dep. p. 28. However, the test was given in an informal setting and the officers graded their own tests. Plaintiff Dep. pp. 29-30. Once at the firing range, the topic came up again and Plaintiff "told [the superior officer] that, again, that I wasn't cheating and that I told him what I thought." Plaintiff Dep. p. 29. She does not recall exactly what she said, but she did feel compelled to apologize for it later. Plaintiff Dep.

-2-

pp. 29-30. She also testified that the confrontation, which was not heated, was because the Supervisor failed to drop the issue. Plaintiff Dep. pp. 29-30.

In April 2006, Plaintiff was written up for taking a meal break without notifying a dispatcher. Plaintiff Dep. Ex. 6. That was Plaintiff's third violation of that policy. Plaintiff Dep. Ex. 6. Plaintiff admits the violation, but testified that "everyone does it all the time or did it all the time." Plaintiff Dep. p. 31. Her superiors found out about it because Cooper, with whom she was dining at the time, was injured as they left the restaurant to respond to a call. Plaintiff Dep. pp. 31-32. In August 2006, Plaintiff was written up for reporting late for duty for the third time in a two-month period. Plaintiff Dep. Ex. 7. She admits that violation as well. Her August 2006 writeup for tardiness counted as her fourth offense in a calendar year, which was deemed "excessive." Plaintiff Dep. Ex. 7. In October 2006, Plaintiff was disciplined for using a City printer to print more than 60 pages of materials for her personal use. Plaintiff Dep. Ex. 8. Plaintiff admits that violation, but testified that she had "hit the print key by mistake. I did not intentionally print these copies." Plaintiff Dep. p. 34. In December 2006, Plaintiff was written up for '[f]ail[ing] to report to duty." Plaintiff Dep. Ex. 9. She had gone on vacation and thought she had requested to be off-duty Christmas. Plaintiff Dep. p. 36. She had not. Plaintiff Dep. pp. 36-37.

Plaintiff's supervisor, Lieutenant Randy Fisher completed a performance appraisal for Plaintiff for the period from November 2005 to November 2006. Plaintiff Dep. Ex. 10. He gave her an overall score of 3.0, or "meets expectations," and made comments such as "excellent job on paperwork" and "very precise when documenting information." Plaintiff Dep. Ex. 10. Plaintiff also received a raise of $1,630.20.13. However, Fisher also noted a number of areas where she needed to improve. Plaintiff Dep. Ex. 10. She received "below expectations" marks under the heading

"ATTENDANCE," where it was noted that she "has <u>frequent</u> excused or unexcused absences," "has <u>frequent</u> excused or unexcused tardiness," and "[f]<u>requently</u> leaves work/work station without justification."  Plaintiff Dep. Ex. 10 (emphasis in original).  She received another "below expectations" under the heading "INITIATIVE AND ATTITUDE" where it was noted that she only "[o]ccasionally approaches work with a positive attitude." Plaintiff Dep. Ex. 10.  Finally, under "COORDINATION OF WORK," she was graded as "below expectations" because she "[o]ccasionally wastes resources/supplies." Plaintiff Dep. Ex. 10. Under the Justification for Performance Ratings section, Fisher wrote that Plaintiff

> • "has to be watched when in her area to make sure she stays within an area assigned or signing out when she is required to do so;"
> • "She is frequently missing work and has used well past the allowed sick days by the city. At times this has caused a strain on the other members of the shift. She has also been tardy numerous times for her designated tour of duty."
> • "Carol could display a better attitude during her tour of duty. Her attitude is very negative a lot of the time."

Plaintiff Dep. Ex. 10.  Fisher concluded by stating:

> Since I started working with Carol I have seen her miss numerous days by calling in sick when she did not have sick time left. Her attitude tends to be negative during many roll call sessions. I feel that if she worked on this area it would make the day go easier. I have seen some change in this area lately, but feel she still needs to work on it. Carol does an excellent job on paperwork and is very precise when documenting information. I feel that if Carol could work on her attitude and try to focus more on service in the community she could be an outstanding officer. She has many tools that make a great officer; she just needs to work at cultivating them into her daily routine.

Plaintiff Dep. Ex. 10.  Plaintiff does not dispute any of the ratings she received and agrees with all of Fisher's comments in the evaluation. Plaintiff Dep. pp. 37-40.

Following this evaluation, Plaintiff's next six months of employment passed without incident. However, in May 2007, Plaintiff was still going through a less than amicable divorce.  Plaintiff Dep.

p. 43.  She testified that she felt the divorce was affecting her work and may have led to the four disciplinary issues which followed.  Plaintiff Dep. p. 43.  On May 28, 2007, Plaintiff received an oral warning for an incident that had occurred on May 17.  Plaintiff Dep. Ex. 11.  Plaintiff had written two traffic tickets but omitted some mandatory information from each of them, believing the municipal court staff would recognize that the tickets were for the same individual and obtain the missing information for each from the other ticket.  Plaintiff Dep. p. 41.  A court employee returned the tickets to Plaintiff with the notation, "C., Please provide the description of the defendant [and] return to court ASAP.  Thanks.  Robin."  Plaintiff Dep. Ex. 11.  Plaintiff, thinking her response would be received as a joke, wrote in reply, "Sorry, teacher.  Will do better next time.  Do I need to get my mommy or daddy to sign this?"  Plaintiff Dep. Ex. 11.  Not amused by her comments, a court employee replied, "No you need to talk with the Major W[alt] F[loyd] and your [lieutenant]."  Plaintiff Dep. Ex. 11.  She received another oral warning on May 28, 2007, for leaving her assigned patrol area that same day.  Plaintiff Dep. Ex. 13.  She was found at a local hotel, parked in her patrol vehicle next to Cooper's patrol vehicle.  Plaintiff Dep. p. 46.

Plaintiff also received a 12-hour suspension and was placed on six-months probation on May 28, 2007, for two unrelated matters.  In the first, she was cited for tardiness, arriving at work late on three occasions, with the last occurring on May 27.  Plaintiff Dep. Ex. 12.  In the second matter, Plaintiff was written up after a driver complained to the City about Plaintiff's conduct during a traffic stop.  Plaintiff Dep. Ex. 14.  After reviewing Plaintiff's dashcam footage, her supervisors felt that her behavior had been "unprofessional and unfriendly" and "hostile" after the driver questioned a ticket Plaintiff had given her, reaching in the driver's vehicle and threatening to tear up the ticket and write one for a greater offense.  Plaintiff Dep. Ex. 14.  In addition to the suspension and probation, Plaintiff

was ordered to attend anger management classes. Plaintiff Dep. Ex. 15.

Plaintiff received her next performance appraisal from Fisher on December 28, 2007. Plaintiff Dep. Ex. 17. Fisher made comments such as "consistent with work expected of her," "works hard," "neat and precise with paperwork," "extremely thorough when completing documentation of events," "very dependable with doing paperwork," "rarely has to be watched over and meets most deadlines," "occasional absences good about staying in area and not leaving without permission of supervisor," "uses good judgment," "good at anticipating consequences of her actions," working well with the community," and "Carol has really worked at communicating with others and passing on information." Plaintiff Dep. Ex. 17. Fisher noted improvement in every area except the level of Plaintiff's absences. Plaintiff Dep. Ex. 17. Floyd, Fisher's superior, changed Fisher's rating of Plaintiff's use of "judgment in routine situations" from "meets" to "below expectations." Plaintiff Dep. p. 53. Fisher noted that since the "issues back in May of this year [in which Plaintiff] ha[d] some issues dealing with a citizen as well as some other issues," her performance and attitude had improved. Plaintiff Dep. Ex. 17. Despite the fact that she was just concluding her probation, Bailey approved a pay increase of $1,774.97 for Plaintiff. Plaintiff Dep. Ex. 17.

On March 5, 2008, Plaintiff received a twelve-hour suspension for using the City's National Crime Information Center access for personal reasons. Plaintiff Dep. Ex. 3. The NCIC is maintained by the FBI and access is restricted to official use only. FBI NCIC Fact Sheet (attached as Ex. A to Defendant's Motion). Plaintiff understood that personal access was forbidden and that she could be disciplined if her unauthorized use was discovered. Plaintiff Dep. p. 24. Nonetheless, she provided the NCIC operator with a valid case number for a case she was handling, but instead gave the operator a name to search that had nothing to do with the case. Plaintiff Dep. p. 23. The name she gave the

operator was the name of her friend's husband. Plaintiff Dep. p. 23. City policy advised police officers that unauthorized access could lead to the NCIC "discontinu[ing] criminal history service to the [offending] agency . . . ." Plaintiff Dep. Ex. 4. She acknowledges that she placed at risk a "very important" tool for the City's law enforcement operations. Plaintiff Dep. p. 27.

The City has an arrangement with certain private properties for City police officers to provide security details. Plaintiff Dep. p. 56. The agreement is entirely voluntary, with officers viewing it as an opportunity to earn some extra money. Plaintiff Dep. p. 57. The rules for signing up for the details provide that "[f]ailure to work a detail will result in suspension of all security details for 30 days from the date of the no-show." Plaintiff Dep. Ex. 18. In other words, there were no ramifications as far as the officers' employment with the City was concerned. Plaintiff Dep. pp. 57-58. The rules also state that "[i]f you can't work a detail due to an emergency or other reason contact Sgt. [Chris] Johnson . . . as soon as possible" and provides two phone numbers. Plaintiff Dep. Ex. 18.

Plaintiff had signed up to work a voluntary security detail scheduled for June 23, 2008. Plaintiff Dep. p. 58. She was scheduled to work from 9 p.m. to 3 a.m. Plaintiff Dep. p. 60. At some point in time, Plaintiff's babysitter notified her that she would be unable to watch Plaintiff's ten-year-old daughter that evening. Plaintiff Dep. p. 60. Plaintiff has no idea how much advance notice she had. Plaintiff Dep. p. 60. Plaintiff did not attempt to find another babysitter. Plaintiff Dep. p. 62. Instead, she decided that she would take her daughter to the City's main fire station and leave her in the female sleeping quarters while Plaintiff worked the security detail. Plaintiff Dep. p. 61. At the time the City only employed three female fire fighters. Plaintiff Dep. p. 61. Thus, Plaintiff did not think anyone would be using the female sleeping quarters. Plaintiff Dep. pp. 61-62. When Plaintiff arrived at the fire station, she took her daughter upstairs to the sleeping quarters. Plaintiff Dep. p. 62. She does not

recall if she saw anyone at any point in time while she was at the fire station. Plaintiff Dep. p. 62. Plaintiff left her daughter with some snacks, a handheld video game unit and a cell phone, and went to work the security detail. Plaintiff Dep. pp. 64-65. She assumed there were people in the fire station, but made no attempt to let anyone know that she was leaving her daughter there. Plaintiff Dep. pp. 62, 66. Plaintiff believed at the time that her daughter would be safe in the firehouse. Plaintiff Dep. p. 58. After she had been on the security detail "for quite a while," she received a phone call from a sergeant advising her that her daughter had been found in the sleeping quarters and that Plaintiff needed to come pick her up. Plaintiff Dep. pp. 67-68. Plaintiff then picked up her daughter, took her to a fellow officer's house and left her there while she completed her security detail. Plaintiff Dep. p. 68. At some point, Plaintiff was advised that she was suspended from security details until further notice. Plaintiff Dep. pp. 70-71.

On July 3, 2008, Plaintiff was terminated as a result of her accumulated acts of misconduct and poor judgment. Plaintiff Dep. Ex. 19. Prior to Plaintiff's termination there were no discussions with Plaintiff regarding the incident. Plaintiff grieved her termination, which was affirmed by the City's grievance committee. Plaintiff Dep. Ex. 23. She subsequently filed a charge of discrimination with the South Carolina Human Affairs Commission ("the SCHAC") in which she asserted that she was terminated due to her gender in violation of Title VII. Plaintiff Dep. Ex. 1. Plaintiff stated in her SCHAC Initial Inquiry Questionnaire "All statements are factual, I agree that I did the infractions that were a city Policy violation only. In four years of service as an officer and two years as a dispatcher I had only been written up 1 time before William Bailey took office as Director." Plaintiff Dep. Ex. 1. Of nine written/oral reprimands received, eight of them were after William Bailey became director. Plaintiff Dep. Ex. 1. The SCHAC found that "[n]o cause" existed to support Plaintiff's claim. Plaintiff

Dep. Ex. 24.  The Equal Employment Opportunity Commission then reviewed the SCHAC's findings and adopted them.  Plaintiff Dep. Ex. 25.  Plaintiff then filed the instant action.

### III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.  Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present

-9-

evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

Title VII makes it unlawful for an employer to discriminate against an employee with respect to compensation, terms, conditions or privileges of employment on the basis of race. 42 U.S.C. § 2000e-2(a). A plaintiff may avoid summary judgment on a Title VII discrimination claim through direct or circumstantial evidence. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) . Direct evidence of discrimination is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." Cassity v. Geren, 749 F.Supp.2d 380, 402 (D.S.C. 2010) (citing Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir.1999) (en banc), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)).

Plaintiff offers as direct evidence of gender discrimination a conversation Bailey had with a female officer, Dana Griffin, regarding the difficulty in trying to decide how to accommodate a certain, pregnant officer with light, only day-shift duty because of her pregnancy. Bailey Dep. pp. 35-36. When asked what he was going to do, he answered that he was going to let Administration deal with it. Bailey Dep. pp. 35-36. He recounted the conversation:

> And she right off the bat said well, she should be able to do whatever she needs to do

> and that led into a conversation which required a question of, or her comment of saying I came to work here to have–because I knew the City would support me having children. And I said I agree, but how many children should an officer be able to have before it infringes on what the community is paying for, and that officer's response was: "As many as I would like to have." Any question back to her was could an officer have nine, could an officer have ten? And her response back was: "As many as I would like to have," and I said Dana think about it, if your going to be out of work for a year every time you have a child and you are going to have nine children and you're a police officer, a third of your career is going to be doing something that you weren't hired to do. How is that fair to the taxpayers we provide service for. And that was the conversation. And then of course the comment: If that's the case the city would be a fool to hire another woman.

Bailey Dep. p. 36. Griffin recognized that the issue was not that the officer was female or pregnant; rather, Bailey was discussing the fact that he did not like having to "bend over backwards" to accommodate a subpar officer. Griffin Affidavit. Griffin perceived the conversation as a "joking debate taken to extremes." Griffin Affidavit. Griffin "did not at all take [Bailey's comments] as a legitimate statement . . . that he had any animosity towards female public safety officers." Griffin Affidavit.

Importantly, "statements by decisionmakers[1] unrelated to the decisional process itself"are not direct evidence. Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J. concurring); McCray v. Pee Dee Regional Transp. Authority, 263 Fed.Appx. 301, 305-306 (4th Cir. 2008) ("In establishing evidence of discrimination, derogatory remarks may constitute direct evidence, as long as the remarks were related to the employment decision in question and were not stray or isolated."). Bailey's comments regarding pregnant officers are unrelated to his decision to terminate Plaintiff's employment and, thus, do not qualify as direct evidence of gender discrimination.

---

[1] It is undisputed that Bailey is the relevant decisionmaker in this case.

When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[2] Under the McDonnell Douglas framework, Plaintiff has the initial burden of establishing a prima facie case of discrimination. "To establish a prima facie case [of disparate discipline] a plaintiff must show '(1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person.' " Lightner v. City of Wilmington, N.C., 545 F.3d 260, 264-65 (4th Cir. 2008) (quoting Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985) (adapting the McDonnell Douglas framework for the employee discipline context).[3]

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson

---

[2] The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

[3] This framework is in accord with the general framework for setting forth a prima facie case of discrimination. See, e.g., White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir. 2004) ((1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment). See also Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir.2005); EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n. 2 (4th Cir.2001) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination.  Reeves, 530 U.S. at 143.  Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff.  Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against her.

     Defendant argues that Plaintiff cannot establish a prima facie case of discrimination because she cannot show that similarly situated male employees were disciplined less harshly than her for similar conduct.  To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " See Ward v. City of North Myrtle Beach, 457 F.Supp.2d 625, 643 (D.S.C.2006).  In addition, to determine whether a plaintiff's misconduct is comparable in seriousness to that of employees outside the protected class, a court should consider "the gravity of the offenses on a relative scale." Moore v. City of Charlotte, 754 F.2d 1100, 1107 (4th Cir.1985) (quoting Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)). Exact similarity between the compared offenses is not required.  Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir.1993)("[T]he comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances.").

Plaintiff discusses several male officers who she claims were treated less harshly than her for similar conduct.[4] Plaintiff alleges that "Chris Deal has been involved in numerous criminal domestic violence complaints where he has been uncooperative with the actual agency that he worked for when investigating these complaints." Plaintiff Dep. p. 91. Plaintiff presents one North Myrtle Beach Incident Report regarding Officer Deal's confrontation with his girlfriend. SCHAC File. Plaintiff has no firsthand knowledge of this incident. Plaintiff Dep. p. 91. Plaintiff argues that Defendant ignored the fact that Officer Deal was significantly intoxicated and refused to provide a voluntary statement because of his inebriated state. SCHAC File. The record reveals that Deal was the victim in the incident, it was reviewed by SLED, and Deal and the investigating officers were cleared of any wrongdoing. SCHAC File; Bailey Affidavit.

Plaintiff also asserts that on another occasion Deal was driving while intoxicated, stopped by two other officers and was not arrested. SCHAC File. The other officers took Deal home. SCHAC File. No one was disciplined in this occurrence. SCHAC File. Bailey avers that he heard rumors that Deal had been stopped by Officers Kovarsky and Wilson, and then driven home. Bailey Affidavit. Upon questioning Kovarsky and Wilson, both confirmed that they had stopped Deal. Bailey Affidavit. However, they advised Bailey that Deal was not intoxicated; rather, he was distraught over a fight he had with his girlfriend. Bailey Affidavit. They advised Bailey that they did not feel that Deal was emotionally stable enough to drive and gave him a ride home. Bailey Affidavit. Bailey warned them

---

[4] Plaintiff identifies several purported comparators in her deposition and Defendant discusses each of them in its Motion for Summary Judgment. However, Plaintiff addresses only a few of those comparators in her Response. Thus, the undersigned addresses in detail only those comparators discussed by Plaintiff in her Response. Plaintiff fails to meet her burden of establishing that the other comparators (those not specifically discussed by Plaintiff) are similarly situated.

that their actions might be viewed suspiciously by others and that if it ever happened again he would bring SLED in to investigate. Bailey Affidavit. Bailey also spoke with Deal who confirmed Kovarsky and Wilson's story. Bailey Affidavit. Bailey advised Deal to seek counseling regarding his relationship with his girlfriend. Bailey Affidavit.

Both of these events with Deal involve his activity outside his employment with Defendant. Plaintiff fails to point to any work-related offenses committed by Deal. Furthermore, while Deal was the subject of scrutiny, he was never determined to have committed any actual misconduct. A similar comparison was made in Reed v. Town of Williston, No. 1:08-cv-2451-MBS, 2010 WL 1409425 (March 31, 2010). There, a former recreation director was terminated for poor performance. The plaintiff attempted to compare himself to another employee "who was accused of sexually harassing young girls involved in a community service program." Id. at *11. The other employee had been investigated by SLED but was not convicted of any crime. Id. The court held that "[b]ecause there has been no finding adverse to [the purported comparator he] is not a proper comparator for Plaintiff." Id. Likewise, Deal is not a proper comparator for Plaintiff.

Plaintiff testified she heard rumors that Johnny Marrero and Chris Schick used the NCIC for personal reasons but were not disciplined. Plaintiff Dep. pp. 93-94. Plaintiff argues that the only reason she was disciplined for her personal use of NCIC is because she was caught. Bailey testified he had no knowledge of other officers in the City using NCIC for personal reasons. Bailey testified there were no logs in the cars that had NCIC access and therefore no one knew if the individuals were violating the NCIC policy. Bailey Dep. p. 28.

> A plaintiff charging an employer with disparate discipline must show the decisionmaker "consciously overlooked" misconduct by others outside the protected class "when he disciplined [plaintiff] more severely." Moreland v. Miami-Dade

> County, 255 F.Supp.2d 1304, 1313 (S.D.Fla. 2002) (internal quotation omitted). The mere fact that a decisionmaker held a position in the plaintiff's chain of command "is not evidence that he personally knew of each comparators' misconduct or the discipline each supervisor imposed." Id. at n. 5. And "unless [the decisionmakers] knew of the [comparators' misconduct] the events cannot be considered in determining whether [plaintiff and his comparators] are similarly situated." Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1317 n. 5 (11th Cir. 2003); accord, Anderson v. WBMG-42, 253 F.3d 561, 567 n. 3 (11th Cir. 2001) (comparator's misconduct irrelevant where no evidence existed that middle manager brought misconduct to decisionmaker's attention).

Duggan v. Sisters of Charity Providence Hospitals, 663 F.Supp.2d 456, 463 (D.S.C. 2009). Plaintiff does not have specific knowledge that Marrero or Schick misused the NCIC. More importantly, however, is that Bailey had no knowledge of other officers using the NCIC for personal reasons. Thus, Plaintiff cannot show that Marrero or Schick were treated more favorably for similar behavior.

Mike Arbuso and Plaintiff both violated the Public Safety Department's visitors policy. Arbuso was reported for having a female guest in the male fire station sleeping quarters after hours. Plaintiff Dep. pp. 19-20. Plaintiff alleges that Arbuso was having a "sexual relationship" with the female but admits she has no firsthand information about the incident and cannot identify who reported it to her. Plaintiff Dep. pp. 19-20. Based upon the recommendation of Arbuso's supervisor, Kenneth Frye, Arbuso was suspended for 24 hours without pay and placed on six-months probation for allowing a guest in the fire station after ten o'clock at night and for having a guest in the sleeping quarters. Bailey Dep. Ex. 10.

Bailey explained why he felt Plaintiff's violation of the guest and sleeping quarter policies was worse than Arbuso's:

> In Ms. Johnson's situation, the information given to me by the fire captain who discovered a 10-year-old child in a public building which was locked and no knowledge of anyone in that building that that child was there. Ms. Johnson not only put the child in jeopardy but put the City's liability at issue, and also she was on the

> verge, if not, she did violate South Carolina state law by child neglect. There are a number of things that could have happened while that child was in that fire department, and just a continuation, in my opinion, of her poor judgment.

Bailey Dep. p. 32.

Even assuming Plaintiff's and Arbuso's violations of the visitors policy were of the same magnitude, Plaintiff fails to point to any evidence of any other disciplinary infractions committed by Arbuso. Plaintiff, conversely, had numerous infractions, as set forth above. Plaintiff argues it is unnecessary for the court to consider each and every write up Plaintiff received because they are not related to her actual termination of employment. However, the case law says otherwise. "To focus on one piece of the record without considering the whole would distort the permissible inferences to be drawn." Cook v. CSX Trans. Corp., 988 F.2d 507, 512 (4th Cir. 1993). "Instead, a plaintiff's performance record should be examined in its entirety." Stevens v. Del Webb Communities, Inc., 456 F.Supp.2d 698, 729 (D.S.C. 2006) (Report and Recommendation adopted by Duffy, J.). See also Karpel v. Inova Health System Services, 134 F.3d 1222, 1228 (4th Cir. 1998) ("It would defy logic to look at each sort of attendance, disciplinary, or performance problem in a vacuum; it is the conglomeration of these issues that made Ms. Karpel an unsatisfactory employee that Inova was justified in terminating."). Plaintiff's employment was not terminated based upon one act of wrongdoing but because of accumulated disciplinary and performance issues. Plaintiff Dep. D.Ex. 19. Thus, consideration of all her disciplinary actions when comparing her to other officers is necessary. Without evidence that Arbuso had a similar, lengthy list of reprimands, he cannot be an appropriate comparator.

In sum, Plaintiff fails to present any sufficient comparators to establish that similarly situated, male employees engaged in conduct similar to Plaintiff's yet received more favorable treatment.

Accordingly, Plaintiff fails to create a prima facie case of gender discrimination.

Furthermore, Defendant proffers a legitimate, nondiscriminatory reason for Plaintiff's termination: she engaged in numerous policy violations and exhibited poor judgment. In her deposition, Plaintiff agreed: "I gave them cause to terminate me by actually committing the policy violations. I believe they used that as a reason to terminate me." Plaintiff Dep. p. 89. Plaintiff does not argue in her Response that Defendant's reasons are pretext for discrimination. Thus, Plaintiff fails to refute Defendant's legitimate, nondiscriminatory reason for her termination and fails to carry her burden of presenting sufficient evidence from which a reasonable jury could conclude that Defendant discriminated against her because of her gender. Accordingly, summary judgment is appropriate.

## V.     CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 23) be granted and this case be dismissed.

                                                                   s/Thomas E. Rogers, III
                                                                  Thomas E. Rogers, III
                                                                  United States Magistrate Judge

January 25, 2012
Florence, South Carolina

**The parties are directed to the important notice on the following page.**